Carol CHESEMORE, Daniel Donkle, Thomas Gieck, Martin Robbins and Nannette Stoflet, on behalf of themselves, individually, and on behalf of all others similarly situated, Plaintiffs,

v.

ALLIANCE HOLDINGS, INC., A.H.I., Inc., David B. Fenkell, Pamela Klute, James Mastrangelo, Stephen W. Pagelow, Jeffrey A. Seefeldt, Alpha Investment Consulting Group, LLC and John Michael Maier, Defendants,

and

Trachte Building Systems, Inc., Employee Stock Ownership Plan and Alliance Holdings, Inc., Employee Stock Ownership Plan, Nominal Defendants.

No. 09–cv–413–wmc.

United States District Court, W.D. Wisconsin.

Feb. 17, 2011.

Andrew W. Erlandson, Marie A. Stanton, Hurley, Burish & Stanton, S.C., Madison, WI, Karen L. Handorf, Michelle Yau, Monya Monique Bunch, Robert Joseph Barton, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Marc I. Machiz, Cohen Milstein Sellers & Toll PLLC, Philadelphia, PA, for Plaintiffs.

Angela M. Rust, Lora L. Zimmer, Patrick F. Koenen, Hinshaw & Culbertson LLP, Appleton, WI, Christopher Craig Woods, Kristen Marie Blankley, Squire, Sanders & Dempsey, LLP, Columbus, OH, Jeffrey J. Wedel, Ryan A. Sobel, Squire, Sanders & Dempsey, LLP, Cleveland, OH, Karen L. Handorf, Karen L. Handorf, Karen L. Handorf, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Charles B. Wolf, Patrick Williamson Spangler, Vedder Price P.C., James J. Convery, Laner, Muchin, Chicago, IL, Lynn Marie Stathas, Reinhart Boerner Van Deuren S.C., Madison, WI, Alan I. Silver, Jonathan Paul Norrie, Kevin Patrick Hickey, Bassford Remele, P.A., Minneapolis, MN, Tara M. Mathison, Davis & Kuelthau, S.C., Milwaukee, WI, for Defendants.

## OPINION and ORDER

WILLIAM M. CONLEY, District Judge.

In this putative class action, plaintiffs Carol Chesemore, Daniel Donkle, Thomas Gieck, Martin Robbins and Nannette Sto-

flet were long-term employees of Trachte Building Systems, Inc. ("Trachte") and remain participants in the company's Employee Stock Ownership Plan and Trust ("TBS ESOP" or "the Plan"). Plaintiffs allege that defendants Alliance Holdings, Inc. ("Alliance"), A.H.I., Inc., David B. Fenkell, Stephen Pagelow, Pamela Klute, James Mastrangelo, Jeffrey Seefeldt, Alpha Investment Consulting Group, LLC and John Michael Maier each played a role in setting up and executing a complex transaction which rendered plaintiffs' interests in an employee stock ownership plan essentially worthless in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461.[1] Specifically, plaintiffs allege that a few years after Alliance had purchased 80% of the stock in Trachte, (1) Alliance "spun off" plaintiffs' valuable interests in the Alliance Holdings, Inc. Employee Stock Ownership Plan and Trust ("AH ESOP") into the TBS ESOP; (2) Trachte was resold and saddled with an unreasonable debt load; (3) Alliance sold its Trachte stocks to the TBS ESOP at an inflated price in exchange for the employees' valuable Alliance and AH ESOP shares; and (4) Trachte made "phantom stock" payments to certain defendants as a reward for facilitating their sale.

Now before the court are motions to dismiss brought by all defendants, except

Alpha Investment Consulting Group, LLC and John Michael Maier.[2] The movants contend that, even taking plaintiffs' claims against them on their face, each component of the challenged transaction met the technical requirements of ERISA and, therefore, are insufficiently pled to permit relief to be granted. Because an alternative reading of the allegations of the amended complaint is permissible—one suggesting that the transaction as a whole was a sophisticated scheme to wring most of the value out of Trachte at an inevitable loss to the employees' ESOP accounts, orchestrated in breach of fiduciary duties owed by Alliance and the other defendants—the court will deny the motions and allow discovery to proceed on the claims as pled,. except as specifically noted below.

## ALLEGATIONS OF FACT [3]

### A. *Alliance's Acquisition of Trachte*

Alliance is a holding company that buys, holds and sells other companies. Alliance markets itself to majority shareholders of small and medium-sized, privately-held operating companies seeking to be bought out while deferring taxation on the proceeds of the sale. When selling a company, Alliance offers potential buyers a phantom stock plan for the acquired company providing "substantial reward for each of our management team."

---

**1.** In plaintiffs' amended complaint, they name a new plaintiff, Nannette Stoflet, and two new defendants, Alpha Investment Consulting Group, LLC and John Michael Maier, and drop their claims against former defendant Eric M. Lynn. The caption has been amended accordingly.

**2.** Defendants Alpha and Maier answered instead, and plaintiffs have filed a motion to strike affirmative defenses from that answer which is addressed in a separate opinion. In addition, defendants Mastrangelo, Klute and Seefeldt have filed an unopposed motion for leave to file documents outside the pleadings, including a copy of the TBS ESOP's govern-

ing plan and summary plan description, their valuation letters and fairness opinions, and other documentation related to the alleged fiduciary roles defendants played in the transactions at issue. The motion will be denied as unnecessary, though the court will consider the documents to the extent permitted at this stage of the proceedings pursuant to Fed. R.Civ.P. 12(d). *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir.2009).

**3.** The following allegations are drawn from the plaintiffs' complaint and referenced documentation provided by defendants.

Alliance sponsors the nominal defendant AH ESOP. When Alliance purchases an operating company, the employees participating in that operating company's ESOP become participants in the AH ESOP. If Alliance sells the operating company, those employees' accounts are "spun off" from the AH ESOP.

At all times relevant to the complaint, the AH ESOP owned almost all the common stock of Alliance directly or indirectly.[4] Alliance was the named fiduciary for the AH ESOP and had the authority to appoint the plan administrator and trustee and to monitor their performance. Defendant David B. Fenkell has been the trustee of the AH ESOP since 1995, and is a member of the Alliance Board of Directors, with responsibility for appointing the Plan administrator and trustee.

In September 2002, Alliance purchased Trachte for $24 million through a complex transaction. Essentially, Trachte's employee stock ownership plan (the "old TBS ESOP") purchased sufficient stock to obtain an 80 percent ownership interest in Trachte. Alliance then purchased the 80 percent owned by old TBS ESOP and merged old TBS ESOP into the AH ESOP. The remaining 20 percent of shares stayed with defendant Stephen W. Pagelow, who had purchased Trachte in 1984 and was its president and chief operating officer. Effective October 1, 2002, Trachte established two phantom stock plans to reward key employees of Trachte and Alliance, respectively. The phantom stock plans entitled these eligible employees to receive cash based in part on the value of the Trachte stock.

Sometime in 2006, Alliance began looking for a buyer for Trachte. In early 2007, Alliance started negotiating a sale of Trachte with HIG Capital, a private investment firm. HIG Capital made an offer to purchase Trachte from Alliance, however it refused to purchase Trachte at the price Alliance was asking because it believed that "market data indicated [that] the self storage [industry in which Trachte operated] ha[d] matured" and orders had "softened in 2007." (Am. Compl. (dkt. # 79) at 25.) At about the same time, Alliance marketed Trachte to other potential buyers, including Tricor Pacific Capital, Inc. After failing to find an outside buyer, Alliance decided to sell Trachte to Trachte's own employees through a newly-created, Trachte-sponsored Employee Stock Ownership Plan, also a nominal defendant here.

### B. *Alliance's Preparations For Resale of Trachte*

#### 1. *Letter of Intent*

In early 2007, defendants James Mastrangelo and Jeffrey A. Seefeldt began discussions with Fenkell about the acquisition of Trachte by a new Trachte employee stock ownership plan. Mastrangelo and Seefeldt acted as "representatives" of this yet-to-be-formed TBS ESOP.

Fenkell drafted a "Letter of Intent" dated April 19, 2007, setting forth the proposed terms of an equally complex buyback of Trachte by the new TBS ESOP. Mastrangelo and Seefeldt signed the letter as "Representatives" of the yet-to-be formed TBS ESOP, Pagelow signed as one of the "Selling Shareholders" and Seefeldt signed again as the president of Trachte. The steps set out in the letter of intent included:

---

4. Until 2005, the AH ESOP owned almost all the common stock of Alliance directly. In 2005, the ownership of the common stocks shifted. AH ESOP directly owned about half of the Alliance common stock, AH Transition owned almost all the remaining stock and the AH ESOP owned all the common stock of AH Transition.

1. Seefeldt and Mastrangelo would cause Trachte to establish the TBS ESOP;

2. Alliance would sell $7.5 million of Trachte stock to the TBS ESOP in exchange for promissory notes;

3. the Trachte employee's accounts (now made up of stock in Alliance and its subsidiary AH Transition) would be "spun off" from the AH ESOP into the TBS ESOP;

4. the TBS ESOP would repay the promissory notes with the Alliance and AH Transition stock allocated to Trachte employees' accounts, leaving it only Trachte stock;

5. Trachte would borrow $27.5 million and a subsidiary of Trachte would repay $2.9 million to Trachte on terms negotiated by Seefeldt and Mastrangelo with the assistance of Kenneth Wanko from Alliance;

6. Trachte would make a loan to the TBS ESOP to purchase the remaining Trachte shares held by Alliance and Pagelow;

7. Trachte would terminate the Trachte Building Systems, Inc. Phantom Stock Plan (for certain Alliance employees) and make approximately $4.9 million in cash payments to its participants while leaving intact a Trachte Phantom Stock Plan (for certain Trachte employees); and

8. Trachte would redeem its preferred stock held by Alliance, as well as redeem or purchase its remaining common shares held by Alliance and Pagelow.

The closing was to be a "simultaneous sign and close," leaving the TBS ESOP as the sole shareholder of Trachte at the end of the "buyback."

### 2. Valuations

As trustee of the AH ESOP, Fenkell obtained valuations of the fair market value of Alliance, AH Transition and Trachte from Stout Risius Ross, Inc. Trachte was valued at about $44 million with a per share value of about $13,725.50, but Stout did not apply a discount for lack of marketability.

On July 2, 2007, Trachte trustees Mastrangelo, Seefeldt and Klute obtained a draft valuation and fairness opinion of the proposed transaction from Barnes Wendling Valuation Services, Inc. Barnes found that Trachte's common equity value ranged from $26.2 million to $40.1 million and compared this range to the Stout valuation. Barnes subtracted "phantom equity" payments of about $7.9 million from the Stout valuation and added a $1.9 million "tax shield" to its valuation. Comparing the "adjusted" Stout valuation of $37.6 to its upper range of $40.1 million, Barnes concluded that the proposed transaction was "within the range of reasonableness, albeit near the upper end of the range."

The Trachte trustees obtained a second opinion from RSM McGladrey, which reviewed both the Barnes and Stout valuations. RSM McGladrey sent a letter to the Trachte trustees noting that (1) Barnes's addition of $1.9 million in capital for the value of the Plan's tax shelter "did not have consensus in the valuation community" and (2) Barnes's valuation did not appear to account for the possibility that the face value of what Trachte would receive to fund the transaction might not be equivalent to cash. As the "bottom line," RSM McGladrey stated that, "[b]ased on the total invested capital value being paid, you are paying at the high end of the value

ranges," although it also noted that the "valuation methodology" used by Stout and Barnes was "appropriate and common."

On August 29, 2007, Barnes issued a final valuation and fairness opinion to "the Trustees," relying on the same valuation and methodology as its draft fairness opinion. In particular, the Barnes valuation continued to subtract $7.9 million from the Stout valuation and add a $1.9 million "tax shield" without addressing the concerns raised by the RSM letter. The Barnes valuation compared its own $40.1 million valuation to an "adjusted" Stout valuation when considering whether the $40.5 million transaction was "within the range of reasonableness, albeit near the upper end of the range." Barnes concluded that the terms of the proposed transaction were "fair and reasonable for the purpose of the transaction."

In the final opinion, Barnes did not address: (1) any valuation concerns caused by the $26 million debt Trachte had to incur to loan money to the TBS ESOP for the transaction; (2) Trachte's ability to service that debt; (3) the risk of Trachte defaulting on the loan covenants, which required it to maintain $6.3 million in annual earnings before interest, taxes, depreciation and amortization; (4) Trachte's EBITDA in the prior year had been just that much and present sales were considered "softer" than in prior years; (5) the amount and basis for any control premium, although the stock was valued as a controlling interest; and (6) the discounted offer from HIG Capital and discussions with other potential buyers. In addition, Barnes' final valuation did not include a discount for lack of marketability and treated a $6.2 million cash balance as a non-operating asset, rather than working capital.

### 3. *Appointment of Alpha and Adoption of TBS ESOP*

On August 13, 2007, Trachte engaged defendant Alpha Investment Consulting Group, LLC to act as an "independent fiduciary" for the TBS ESOP. At the time, Pagelow was the CEO, Chairman of the Board of Directors and one of two shareholders of Trachte. (Alliance was the other.) Through defendant Maier, Alpha agreed to be a fiduciary of the TBS ESOP. Trachte agreed to furnish all information reasonably requested by Alpha, with the understanding that Alpha had no obligation to verify the information independently, assumed no responsibility for the accuracy or completeness of the information, and was not required to make an appraisal of Trachte's assets or liabilities. At the time Alpha was retained, the target closing date for the transaction was August 20, 2007.

Three days after being retained, Alpha had preliminarily concluded that the transaction would be in the best interest of the new TBS ESOP and that Alpha would direct the trustees to proceed with the transaction. At that point, Alpha had not been asked to make and had not made any determination whether the purchase price was for fair market value (although it "eventually" provided such an opinion).

On August 22, the shareholders of Trachte (at the time Alliance and Pagelow) removed the existing directors of Trachte (one of whom was Pagelow) and appointed Seefeldt and Mastrangelo as directors. The shareholders also resolved to permit Fenkell and Wanko from Alliance to act as "board observers," with the right to notice and participation but not to vote.

On August 24, 2007, Mastrangelo and Seefeldt, acting as Trachte directors, adopted the TBS ESOP effective as of August 1, 2007, named themselves and defendant Pamela Klute as trustees and ratified and approved the previous engage-

ment of Alpha.[5]

## C. *Terms of Resale*

### 1. *General terms of TBS ESOP*

Under the plan documents, the TBS ESOP's trustees enjoyed a limited ability to invest or incur debt:

Solely at the direction of the Administrator, the Trustee shall invest the Trust Fund primarily in Employer Stock. The Administrator may direct the Trustee to incur debt from time to time to finance the acquisition of Employer stock by the Trust Fund. The Trustee may also invest the Trust Fund in ... other investments desirable for the Trust at the direction of the Administrator.

(Dkt. # 25–2 at 21 (TBS ESOP, § 6.2).) The plan documents also designated the "Administrator" to be "the named fiduciary and plan administrator, as those terms are defined by ERISA," TBS ESOP, § 7.1(b), and assigned the administrator "such duties and powers as may be necessary to discharge its duties hereunder, including ... to appoint and employ individuals to assist in the administration of the Plan and any other agents it deems advisable, including legal and actuarial counsel," TBS ESOP, § 7.6(d).

The "Administrator" is defined as "the person or entity designated by the Plan Sponsor [Trachte] to administer the Plan as set forth in 7.2." (TBS ESOP, §§ 2.2, 2.24.) Under § 7.2 of the TBS ESOP, "[t]he Administrator shall be the Employer [Trachte and its "Affiliated Employers"] or any other person or entity designated by the Employer from time to time."

The plan assigned the "Employer" the "sole fiduciary authority to appoint and remove the Trustee." (TBS ESOP, § 7.1(a).) The "Trustee" is assigned the "sole responsibility for administration of the Trust and administration of assets held under the Trust, all as specifically provided in the Trust," and is authorized "to do all acts, whether or not expressly authorized, which they may deem necessary and proper for the protection of the property held" under the Trust. (TBS ESOP, § 7.1(c).)

### 2. *General terms of AH ESOP*

The AH ESOP designated Alliance to "serve as a Named Fiduciary" with a limited set of responsibilities, among which was the duty to "appoint the Trustee and Plan Administrator and to monitor each of their performances." (Dkt. # 41–2 at 67 (AH ESOP, § 13.1).) The "Trustee" is designated as the "Named Fiduciary with respect to investment of the Fund assets" and is given the powers and duties "set forth in the Trust Agreement," AH ESOP, § 14.3, which include "dispos[ing] of any authorized investment at any time held by him," Alliance Trust Agreement § 2.3(b), and "join[ing] in ... or oppos[ing]" financial changes that affect investments of the Fund.

### 3. *Additional terms of Alliance and TBS ESOPs related to "put option" rights*

Before the spinoff, Trachte employee's accounts were governed by the AH ESOP document, which provides: "In the event of any ... transfer of assets or liabilities to, any other plan, each Participant shall have a benefit in the surviving or transferee plan (determined as if such plan were

---

**5.** Plaintiffs allege that the Plan was "established" "[s]ometime between April 19, 2007 and August 1, 2007; the TBS ESOP document describes a plan "As Established Effective August 1, 2007." (Dkt. # 25–2 at 1.) It

may be the case that an earlier TBS ESOP was established before then and in place until the official plan became effective, but the existence of an earlier plan does not affect the outcome of the present motions.

then terminated immediately after such ... transfer) that is equal in value to or greater in value than the benefit he would have been entitled to receive immediately before such ... transfer in the plan in which he was then a Participant (had such plan been terminated at that time)." (AH ESOP, § 16.5.)

The AH ESOP document also provides that "Employer Securities" distributed from the Plan that are "not readily tradeable on an established market" were "subject to a put option in the hands of the Qualified Holder," allowing the holder to "sell any or all of the Employer Securities received in the distribution to the Employer that employs or employed the Participant" or to the Plan, at a "fair market value." (AH ESOP, § 11.4(b).) Under the AH ESOP, for all transactions except those "with a disqualified person," the "fair market value" is the value determined by an appraiser on the "Anniversary Date coinciding with or immediately preceding the date of the transaction." (AH ESOP, § 11.4(a)(6).)

After the spinoff, Trachte employees' accounts were governed by the TBS ESOP plan. Under that plan, a "distributee" of "Employer stock" would have a right to a "put option not readily tradeable on an established market." In that situation, a distributee could "require that the Employer repurchase the Employer Stock under a fair valuation formula as provided in [IRS] Code § 409(h)(1)(B) and as provided below." (TBS ESOP, § 5.9.) Except for transactions between the Plan and a "disqualified person," the "fair market value shall be determined as of the most recent valuation date." Under the TBS ESOP, "Employer Stock" is "stock that constitutes 'employer securities' under Code § 409(l) with respect to the Employer." (TBS ESOP, § 2.12.)

The term "Employer" in the TBS ESOP includes the "Plan Sponsor" (Trachte) and "its Affiliated Employers." (TBS ESOP, § 2.11.) The plan provides the following definition for "Affiliated Employer":

any corporation which is a member of a controlled group of corporations (as defined in Code § 414(b)) which includes the Plan Sponsor, any trade or business (whether or not incorporated) which is under common control (as defined in Code § 414(c)) with the Plan Sponsor, any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code § 414(m)) which includes the Plan Sponsor, and any other entity required to be aggregated with the Plan Sponsor pursuant to the Regulations under Code § 414(o). The following entities are currently Affiliated Employers of the Plan Sponsor: Fire Facilities, Inc.; Trac–Rite Door, Inc.; and Store–N–Save Self Storage, Ltd."

(TBS ESOP, § 2.3.)

### D. *Completion of Resale*

On August 29, 2007, after Barnes issued its final fairness opinion, defendants completed the transaction. Alliance, through its sole director Fenkell, executed a "spin-off" instrument providing that the assets allocated to AH ESOP accounts of Trachte employees would be spun off and transferred to the TBS ESOP. The instrument did not state a particular amount to be spun off, but did provide that "immediately after the Spinoff Date" the sum of the balance of each participant's account in the Alliance and TBS ESOPs after the transfer must equal the sum of each participant's account in the AH ESOP immediately before "the Spinoff Date" (of August 29, 2007) and the assets in the TBS ESOP should be equal to the sum of the balances of the Trachte employees. (Dkt. # 41–3 at 2.)

On the same day, Alpha directed the Trachte trustees to complete the transaction. In the direction letter, signed by Maier, Alpha concluded that the transaction was in the best interest of the TBS ESOP participants and the price the Plan intended to pay for Trachte stock represented "no more than adequate consideration." The letter listed information that Alpha had reviewed, including the Stout and Barnes valuations and several other documents and sources, but did not list the RSM McGladrey letter.

At some point before the sale of Trachte stock to the Plan, Alliance transferred all of its Trachte stock to defendant A.H.I. Inc., a wholly-owned subsidiary of Alliance. At the time of the transaction, A.H.I. owned "50 percent or more" of the combined voting power of all classes of Trachte stock entitled to vote. Fenkell, acting as Trustee, transferred the accounts of Trachte employees and the assets tied to those accounts (Alliance and AH Transition common stock and cash) from the AH ESOP into the TBS ESOP. Alliance (and presumably AH Transition) redeemed the shares of Alliance (and AH Transition) stock held by Trachte and caused A.H.I. to transfer the common shares of Trachte stock to the TBS ESOP in exchange for promissory notes assigned to Alliance and AH Transition.

Trachte received a $26.6 million loan from J.P. Morgan Chase to repay Trachte's then-existing indebtedness and fund the transaction. Trachte in turn loaned $26.6 million to the TBS ESOP to finance the stock purchase. Trachte borrowed an additional $5.6 million to redeem

preferred and common stock held by Alliance and Pagelow. In addition, Trachte terminated the Trachte Building Systems, Inc. Phantom Stock Plan for Alliance employees and paid its participants $4.9 million. Fenkell was one of the participants of that phantom stock plan. As a result of these transactions, the TBS ESOP owned all outstanding shares of Trachte stock.

### E. *Post Resale Valuation*

As of December 31, 2007, a "5500 report" listed the value of the Trachte stock as about $17 million, the cost of the stock as $34.5 million and the acquisition debt as $26.5 million, with negative $9.3 overall net assets available for the payment of benefits. The account balances of each plaintiff declined by approximately 50 percent within four months of the August 2007 transaction. To service the loans, Trachte reduced its contributions to its 401(k) plan, reduced the amount of paid sick leave, cut the amount of medical benefits provided employees, terminated and furloughed employees, cut the hours and workdays of remaining employees and forced employees to take two pay cuts. On March 18, 2008, Trachte management told Trachte employees that it had $45.7 million in loans outstanding. By December 31, 2008, the Trachte stock held by the TBS ESOP was worthless.

### OPINION [6]

### A. *Prohibited Transfer under § 208 (Count I)*

Spinoffs and other transfers of assets from one qualified plan to another are

---

**6.** Rather than start from scratch after plaintiffs filed their amended complaint, the parties filed supplemental briefs to support their original briefs. These briefs were not always clear as to which of the parties' original arguments were still in play, or about what they viewed to be material changes, if any, in the amended complaint. Rather than attempt to untangle each of the instances in which the supplemental briefs left open whether an original argument is being maintained, the court will presume the parties' maintain their original positions unless the new arguments contradict the previous ones.

governed by § 208 of ERISA (29 U.S.C. § 1058). *King v. Nat'l Human Res. Comm., Inc.,* 218 F.3d 719, 723 (7th Cir. 2000). Section 208 requires a sort of "benefit equivalence." *John Blair Comm'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan,* 26 F.3d 360, 364 (2d Cir.1994). The "equivalence" contemplated by § 208 is that the benefits a participant "would receive" if a plan were terminated immediately after a transfer must be "equal to or greater than" the benefits a participant "would receive" if a plan had been terminated immediately before the transfer. 29 U.S.C. § 1058.

Plaintiffs allege that when Alliance spun off the Trachte employees' accounts into the TBS ESOP, it violated § 208 for three reasons: (1) Trachte employees lost their "put option"; (2) they lost a "control premium"; and (3) the spinoff was part of a larger transaction that was a bad deal for the Trachte employees.

### 1. *Put option*

Plaintiffs contend that their Alliance and AH stocks held in the Trachte employees' accounts were not "Employer Stocks" under the TBS ESOP. According to plaintiffs, only stock of the "Employer" could be "put," and the only entities considered "Employers" under the plan were Trachte and a specified list of "Affiliated Employers," not Alliance or AH.

In this, plaintiffs misread the law, if not the plan. While plaintiffs would read the phrase "Employer Stock" to mean "stock owned by the 'Employer,'" the phrase has a defined meaning under the plan: "stock that constitutes 'employer securities'" as that term is used in 26 U.S.C. § 409(*l*). And § 409(*l*) defines "employer securities" to include stock issued by a corporation that is "a member of the same controlled group" and refers to 26 U.S.C. § 1563(a)

to define which corporations fall into such a "controlled group." 26 U.S.C. § 409(*l*)(2), (4). Section 1563 defines "controlled group of corporations" to include groups of parent-subsidiary corporations in which the parent corporation owns 80% of "the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations." 26 U.S.C. § 1563(a)(1)(B). Thus, the plan does not limit "Employer Stock" to the stock issued by Trachte and a frozen list of its current "Affiliated Employers."

Even assuming plaintiffs were correct that term "Employer" is defined solely by use in the plan, rather than by statute, for purposes of deciding which stock counts as "Employer Stock," the result would be the same. "Employer" is defined to include "Affiliated Employers" and although plaintiffs focus on a list of three entities the plan describes as "currently Affiliated Employers of the Plan Sponsor," the plan defines that term more broadly to include "any" member of a "controlled group of corporations" under Internal Revenue Code § 414(b) (as well as other related groups under § 414(c), (m) or (*o*)). Unfortunately for plaintiffs, the definition of the "controlled group of corporations" referred to in § 414(b) leads right back to that set out in § 1563(a). In the context of such a broad definition, and in light of the fact that the two statute-based definitions coincide, the plan's list of "curren[t] Affiliated Employers" cannot be read as an exclusive list, but rather as a "guide" of entities likely to be "Affiliated Employers."

Plaintiffs make one final attempt to salvage its "put" claim by arguing that the allegations do not establish that Alliance or AH owned 80% or more of Trachte as required under § 1563(a) and, therefore, were not necessarily part of a "controlled

group of corporations." Plaintiffs are correct that the allegations do not *require* a conclusion that Alliance continued to own 80% of the stocks at the time of the transfer. As plaintiffs point out, they allege only that Alliance owned, indirectly through A.H.I., "50 percent or more" of Trachte when the transaction occurred. Thus, plaintiffs argue they have not pled themselves out of court on this claim.

But plaintiffs' pleading proves too clever by half. Plaintiffs allege that Alliance originally purchased 80% of Trachte shares, but do not allege any facts to suggest that any of those shares were transferred out of its control. Plaintiffs' carefully-worded allegation that A.H.I. owned "50% or more" at the time of the transaction provides no basis for inferring that Alliance and its wholly-owned subsidiary owned "less than 80%" for purposes of § 1563(a). Since it is plaintiffs' burden to allege a basis for suit, its pleading falls short.[7] Therefore, defendants' motion to dismiss on its "put option" theory will be granted without prejudice.[8]

2. *Control premium*

Even if Trachte employees enjoyed a "put option," plaintiffs contend their transferred accounts were less valuable because they lost a "control premium" in their Alliance and AH stocks. Plaintiffs point out that before transfer, the stock was held by the AH ESOP, which directly or indirectly owned all outstanding shares of Alliance and AH stock. This total ownership of stock, plaintiffs claim, created an added value. According to plaintiffs, the value of the Alliance and AH stock diminished after transfer because the TBS ESOP then owned only a minority interest in Alliance related to the small portion of Alliance and AH stock attributed to Trachte employees.

This claim is flawed on a number of levels. Most fundamentally, plaintiffs' claim is premised on the assumption that its minority interest in Alliance and AH stock somehow included rights to "control" those companies and their ultimate sale. The facts alleged in the amended complaint establish, if nothing else, this is simply not true. The shares of Alliance and AH stock attributed to Trachte employees were, by themselves, a small minority of all shares. Whether valued immediately before the transaction in the AH ESOP, or immediately after transfer to the TBS ESOP, the minority employees' shares have no "control premium" attached to them for valuation purposes.

Plaintiffs appear to be suggesting that the Trachte employees' shares would somehow be valued as part of the majority holders' shares so long as they are held in the same ESOP, at least for purposes of determining at what price that ESOP would sell the shares. This is perhaps

---

**7.** As the Supreme Court recently held, Fed. R.Civ.P. 8 requires that the "factual content" in the complaint "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Under the present allegations, nothing but speculation supports the inference that Alliance sold away Trachte stock before the transfer, so the allegations fail to allow a reasonable inference to be drawn that Alliance was anything

but a member of a "controlled group of corporations" for which stock could be put under the TBS ESOP. *Cf. Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (allegations must be sufficient "to raise a right to relief above the speculative level").

**8.** Because Rule 8 problems can sometimes be repaired, dismissal is without prejudice, though the Court implies no prediction as to whether plaintiff would later be granted leave to amend the complaint if further allegations were included or proof uncovered.

akin to the notion that a majority share-holder could not sell all assets of the company in a way which unfairly benefitted the majority over the minority, but this is very different than the majority shareholders' ability to sell its controlling shares at a "premium" above minority shares. Alternatively, plaintiffs may be arguing that its minority shares are more valuable when "tied" to the majority shares in a common ESOP, but this "premium," if any, does not derive from "control," as plaintiffs learned all too well here.

Even if this theoretical, lost "premium" had some value, it relates to the value of the Alliance and AH stock. There is, however, no dispute that immediately after the stock was transferred to the TBS ESOP (and throughout the brief period in which the TBS ESOP owned the stock before it was replaced with Trachte stock), no new valuation of that stock occurred.

Assuming Trachte employees had exercised their put option immediately before or after the transfer, the TBS ESOP would require the "Employer" to pay at least "fair market value" for the Alliance and AH stocks. Because that value "shall be determined as of the most recent valuation date" (which would have been the most recent "Anniversary Date" for appraisal under the AH ESOP) and because both Plans would value the stocks in that setting according to the most recent valuation, the AH ESOP would have assigned the same value for put stocks terminated immediately before the spinoff as the TBS ESOP would have assigned for put stocks had it terminated immediately after the spinoff.

Although a later valuation could have led to a loss of value for plaintiffs, all that matters for § 208 is whether there is a difference between the benefits of the plan immediately before the transfer and the benefits of the plan immediately after, as measured by what would happen in each instance if the plan were terminated at that time. 29 U.S.C. § 1058. There is, therefore, not even a theoretical loss of a "premium" on stocks valued *before* the spinoff and, therefore, no violation of ERISA § 208.

### 3. *Spinoff as part of larger transaction*

■ Plaintiffs' final argument is that the transferred accounts were less valuable because the spinoff was part of a larger transaction orchestrated by defendants that could not be stopped and, as such, immediately diminished the value of plaintiffs' holdings. Defendants contend that plaintiff's "bad deal" theory does not fit with § 208 because that section focuses on any change in the value of benefits "immediately" before and after a transfer. Thus, say defendants, even if the "bad deal" was sealed beforehand it was not finalized until after the transfer, meaning no change in value and no § 208 violation at the time of the spinoff.

At least one court appears to side with defendants on this issue. In *In re Fairchild Industries, Inc.*, 768 F.Supp. 1528, 1532 (N.D.Fla.1990), the plaintiffs argued that a transfer of otherwise adequate funds to a new plan violated § 208 because it was "one part of a larger scheme which ultimately deprived the [Plan] participants of the value of their accrued benefits." The court disagreed, explaining that "the plain meaning of the statute requires only that the funds be equal 'immediately before' and 'immediately after' the ... event triggering the necessity of transferring funds." *Id.*

Plaintiffs would distinguish their case from *Fairchild* in that the spinoff here was allegedly *conditioned* on a disastrous buy-back of Trachte stock from Alliance. In other words, it would be reasonable for a jury to infer that Alliance never would

have spun off the Trachte accounts if the exchange of its Trachte stocks for Alliance stocks was not locked in upfront. In *Fairchild*, there was no evidence that the parties to the transaction had entered into an agreement, binding or otherwise, to exchange stock after the spinoff. Rather, the recipient of the spinoff had merely stated an "intent" to use the funds transferred to purchase stock. *Id.* at 1531.

 Section 208 does not require a transferor plan to insure that accounts are handled with care once they are out of its hands; it requires only that the accounts be placed in the transferee account with care to insure that the value of benefits in a transferee account "immediately" after a transfer is equivalent to or better than the value of those benefits "immediately" before the transfer. Thus, the entity responsible for a spinoff cannot be held liable if the recipient mishandles the accounts once spun off. Section 208 cannot be read to ban any transfer involving a potential for loss from subsequent events, lest the word "immediately" be read out of the statute.

The limitations on § 208 liability aim to reflect a shift in responsibility. Once the transferor plan has released the accounts, they become the responsibility of the transferee plan, which has the power to decide how to dispose of those accounts. Generally, the fiduciary of the new, spun-off plan will be able to assess whether subsequent events, such as stock sales, are in the interest of the plan and reject any that are not. To continue to hold the transferor plan liable for acts taken by a transferee plan after transfer would ignore the legal authority, indeed legal obligation, of the transferee plan to act independently in the best interest of its own participants.

At the same time, however, there may be instances when a new fiduciary's hands are already tied upon spinoff, such as alleged here, if the terms of a pre-spinoff agreement imposed a binding agreement to (or serious consequences for rejecting) a stock sale. If so, the new fiduciary may not truly have discretion to act, at least not without disadvantaging its own participants' interests, and the responsibility remains with the fiduciaries who struck the original deal. It may also mean the value of the accounts would crash immediately at the time of spinoff, when the deal is "initiated" and ownership of the accounts changes hands. Said another way, if the spun off accounts come encumbered by a binding, rotten deal, a § 208 violation at least arguably may occur at least assuming perfect information in the market for these shares.

The allegations in the amended complaint support an inference that such a spinoff occurred in this case. Plaintiffs allege that Alliance, Trachte and "representatives" of the future TBS ESOP agreed to and locked in the entire transaction, including both spinoff and buyback, *before* the spinoff. In addition, the TBS ESOP's fiduciaries were allegedly "directed" to engage in the transaction by Alpha, the fiduciary appointed by Trachte whose two shareholders at the time were still Alliance and Pagelow-both allegedly with much to gain if the deal went forward as planned. Finally, as explained below, there were deficiencies in the valuations that may have suggested to a reasonable fiduciary that the deal was not a good one.

The fact that the new TBS ESOP and its fiduciaries accepted the deal without question, and so quickly, despite these arguable red flags, at least suggests they may have had less discretion than they should have. At this point at least, these allegations suffice to support a theory that the spun off accounts came encumbered and the new fiduciaries could, or at least would, not reject the deal without unac-

ceptable, adverse consequences to the new ESOP and/or themselves.

■ The allegations do not, however, get plaintiffs completely past a motion to dismiss their § 208 claim. The fact that the spun off accounts came encumbered may not be enough, by itself, to give rise to such a claim. Section 208 requires only that each participant "would (if the plan then terminated) receive a benefit immediately after the . . . transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the . . . transfer (if the plan had then terminated)." What matters under § 208 is what the plan participants would have received in the *hypothetical* event that an immediate termination of the plan occurred—not the "true" value of their accounts as the transaction actually played out later. As previously discussed, plaintiffs' put option immediately after sale would have been at a stock value determined before sale, meaning they would have had an immediate right to the pre-sale value, assuming Trachte had the funds to honor their put.

But there lies the rub. This court is not comfortable precluding plaintiffs from going forward to make the factual case that, as alleged, the spinoff was part of a larger transaction, which forced the TBS ESOP to accept immediately an unfair, stock exchange. In this case, an inference can be drawn that a termination immediately after spinoff would have allowed participants fewer benefits. Under the TBS ESOP, an Administrator "may direct the Trustee to liquidate and distribute the affected assets in the Trust Fund." (TBS ESOP, § 10.2.)

If the spun off accounts were encumbered, they were less valuable and even an immediate liquidation might yield less to spread around to participants, meaning that the TBS ESOP accounts may in fact have been worth less immediately upon spinoff. If such is the case here, and so it is alleged, a hypothetical termination "immediately after" transfer arguably would have yielded less than termination "immediately before." [9] Therefore, defendants' motion to dismiss will be denied with respect to plaintiffs' theory that Alliance violated § 208 because it was part of a larger bad deal effectively forced on Trachte employees' holding Alliance and AH stock in the AH ESOP.

**B.** *Prohibited Transactions with Parties in Interest under ERISA § 406*

Section 406 of ERISA (29 U.S.C. § 1106) "categorically bar[s] certain transactions deemed likely to injure" a plan. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636 (7th Cir.2005); *see also Reich v. Compton*, 57 F.3d 270, 275 (3d Cir.1995) (transactions prohibited under ERISA § 406 are those "that had been used in the past to benefit other parties at the expense of the plans' participants and beneficiaries") (citing S.Rep. No. 93–383, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4889, 4981). Under § 406(a)(1)(D), a "fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." [10] Under § 406(b)(1)

---

**9.** At least in theory, this claimed catastrophic loss in value differentiates plaintiffs' "total transaction" claim from their "control premium" claim under § 208. This is because the premium loss assumes a smaller diminution in stock value, presumably one Trachte could honor even if all were to exercise their put

option at once, something Trachte could not do if its stock value completely collapsed.

**10.** The term "party in interest" includes fiduciaries of a plan, employers of plan participants and direct and indirect owners of 50 percent or more of voting power or total

and (3), "a fiduciary with respect to a plan shall not ... deal with the assets of the plan in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

### 1. *Defendant Fenkell (Counts III, IV)*

Plaintiffs contend that defendant Fenkell violated § 406 when, in his role as a trustee for the AH ESOP, he allegedly pre-arranged an unfair transfer of the Trachte employees' Alliance accounts in exchange for far less valuable Trachte stock so he would receive a personal payment from the Trachte Phantom Stock Plan. According to plaintiffs, Fenkell violated three different parts of § 406 by (a) causing a transaction that led to a payout for him in violation of § 406(a)(1)(D); (b) dealing with TBS ESOP assets "in his own interest" in violation of § 406(b)(1); and (c) receiving consideration from Trachte in connection with the spinoff he performed in violation of § 406(b)(3).

### a. Causing a prohibited transaction (Count III)

In Count III of their complaint, plaintiffs allege that Fenkell violated § 406(a)(1)(D) because, as fiduciary of the AH ESOP, he "caused" the AH ESOP to engage in the transaction that led to his receiving payment from the Phantom Stock Plan. As fiduciary of the AH ESOP, however, Fenkell had no fiduciary duty to members of the TBS ESOP and had no authority to direct *that* plan to purchase the Trachte stock. Fenkell's actions were limited to spinning off the Trachte employees' accounts into the TBS ESOP.

Plaintiffs contend that Fenkell can still be held liable because he allegedly arranged the terms of the transaction so that the spinoff was the first step in a larger, inevitable and almost instantaneous transaction, in which the TBS ESOP was "stuck" selling its valuable Alliance and AH stock holdings and acquiring lar less valuable Trachte stock as soon as Fenkell spun off the Trachte employee's accounts. Defendants contend that, to the extent Fenkell negotiated the terms of the transaction as a whole (by drafting the letter of intent, for example), he was not acting in his capacity as fiduciary of the AH ESOP.

As defendants point out, a company representative such as Fenkell may wear more than one hat: he is acting as plan fiduciary when he exercises discretionary authority or control over the management of the plan or the disposition of its assets, 29 U.S.C. § 1002(21)(A), but not when he makes "design changes" in the plan or negotiates the terms of a transaction involving the company that may require action by the plan as well. *See Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 757 (7th Cir.1999) ("when company representatives are negotiating the sale of a division, they are not acting in their capacity as a plan fiduciary"); *Sys. Council EM–3 v. AT & T Corp.*, 159 F.3d 1376, 1379–80 (D.C.Cir. 1998) (administrators of plan not acting as fiduciaries while helping reorganize corporate structure by spinning off operations into separate businesses).

Whether Fenkell was truly wearing only the hat of an "administrator," as opposed to that of a fiduciary, when he structured the terms of the transaction is, at this point, a matter of dispute. If, as plaintiffs contend, he crafted a transaction designed to encumber the accounts spun off, he was doing more than merely negotiating the sale of a division as in *Ames,* or reorganiz-

shares of a corporation. 29 U.S.C. § 1002(14).

ing a corporate structure as in *Systems Council*; he was considering whether to sacrifice the interests of plan participants tied to Trachte for his own benefit, or at least a jury might infer on the facts as alleged.

Moreover, plaintiffs point out that several recent district court cases support a wait-and-see approach to deciding whether an individual wearing multiple hats is acting as a fiduciary. *George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1049–50 (N.D.Ill.2009); *Will v. Gen. Dynamics Corp.*, No. 06–698–GPM, 2009 WL 3835883, *2 (S.D.Ill. Nov. 14, 2009). There may be instances in which it is clear even at this early, pleading stage that an actor was not assuming a fiduciary role. *George*, 674 F.Supp.2d at 1050 n. 18 (noting that dismissal of ERISA claim would be proper where defendant owed no fiduciary duty under facts alleged). In this case, however, the alleged non-fiduciary role—negotiation of a transaction between Alliance and Trachte—was focused entirely on the accounts of AH ESOP plan participants related to Trachte, meaning Fenkell may also have had an inherently "fiduciary" role in the negotiations.

Because the allegations support an inference that Fenkell acted as a fiduciary when he arranged the transaction leading to his Phantom Stock Plan payout, he may have "caused" the transfer of Alliance assets to a party in interest in violation of § 406(a)(1)(D). Therefore, defendants' motion to dismiss plaintiffs' § 406(a)(1)(D) claim against Fenkell will be denied.

b. Dealing with assets in own interest or for own account (Count IV)

■ In Count IV of the complaint, plaintiffs allege that Fenkell violated § 406(b)(1) in his role as an AH ESOP trustee, which prohibits "deal[ing] with" plan assets "in his own interest or for his own account." In particular, plaintiffs contend that Fenkell violated § 406(b)(1) by conditioning the spinoff he performed for the AH ESOP on the price the TBS ESOP would pay Alliance for the Trachte stock, which at least arguably could constitute "dealing with the assets of the AH ESOP in his own interest" because Fenkell received a payout from Trachte as part of the transaction.

As explained above, the allegations support an inference that Fenkell may have been acting as a fiduciary of the AH ESOP when he "conditioned" the spinoff on the price of Trachte stock. Even so, defendants contend, Fenkell cannot be held liable for violating § 406(1)(b) because that provision prohibits only improper dealings with the assets of a plan for which the person is a fiduciary. The statute says that "[a] fiduciary with respect to a plan shall not … deal with the assets of the plan in his own interest or for his own account."

At one point, plaintiffs stated that Fenkell dealt improperly with the TBS ESOP's assets. (Pls.' Br. (dkt. # 57) at 27.) In a sense, the facts support plaintiffs' assertions: Fenkell received the payout only once the TBS ESOP was spun off, and he received it from the TBS ESOP, not the AH ESOP. To the extent plaintiffs are attempting to pursue a claim against Fenkell for his dealings directly with the TBS ESOP, however, such a claim fails since he owes no fiduciary duty to this new entity.

Here, Fenkell's dealings with the TBS ESOP may still not have been a true arm's length deal in light of the allegations that Fenkell played a part in setting up the whole transaction beforehand. More important, because Fenkell allegedly set up the TBS ESOP deal while those participants were still part of the AH ESOP, he is also alleged to have "dealt" improperly

with assets from the AH ESOP, by setting up a transaction that included both spinning off the accounts and receiving payment from them. Plaintiff may, therefore, pursue a claim that Fenkell "dealt" improperly with AH ESOP assets that later became TBS ESOP assets by negotiating the terms of the transaction in violation of § 406(b)(1).

c. Receiving consideration

█ Plaintiffs contend that Fenkell violated § 406(b)(3) by receiving a payment from Trachte under the Phantom Stock Plan as part of the same transaction in which he spun off the Trachte accounts from the AH ESOP. Plaintiffs claim this payment conflicted with Fenkell's alleged fiduciary role in spinning off the account. Although defendants point out that Fenkell's fiduciary role was a modest one (carrying out the written terms of the Plan's spinoff amendment), this is still a fiduciary role. The language of § 406(b)(3) leaves little question that plaintiffs state a claim against Fenkell: it is worded broadly to prohibit any "fiduciary with respect to a plan" from "receiv[ing] any consideration" from "any party" dealing with the fiduciary's plan "in connection with a transaction involving the assets of the plan."

Defendants contend that the provision is an "anti-kickback provision" that is not intended to prohibit transactions such as the one at issue in this case, which they describe as one in which the "fiduciary ends up receiving a contractual benefit." (Defs.' Reply Br. (dkt. # 63) at 19.) As alleged at least, defendants' characterization of what occurred is inaccurate: Fenkell did not simply "end up" receiving a contractual benefit in the form of a Phantom Stock payment; his payment under the Phantom Stock Plan was triggered by Alliance's sale of Trachte.

Moreover, defendants cite no case supporting the distinction they draw between "kickbacks" and other "contractual benefits." If defendants' point is that there needs to be a "deal" between the "party dealing with" the plan and the fiduciary, or that the party dealing with the plan (in this case Trachte) must somehow benefit, it is not clear why that is so. What matters under § 406 is whether a particular transaction will likely injure a plan. *Keach,* 419 F.3d at 636. Whether the "dealing" party ends up better off than the fiduciary is, at least to some extent, beside the point.

Defendants add that the Phantom Stock payment was "ERISA-protected." What they mean by that is unclear. To the extent they are suggesting that the payment was a generally permissible way to structure benefits under ERISA, that is also off point; § 406(b)(3) states that an otherwise legitimate method of payment is not "ERISA-protected" if it involves a payment to a fiduciary of a plan from a party dealing with the plan in connection with the plan's assets.

Defendants suggest that to read § 406(b)(3) in this way "would effectively outlaw most if not all 'top hat' plans sponsored by ESOP-owned companies and virtually eliminate an entire class of employee benefit plans described in ERISA § 201(2)." Defendants again do not elaborate, appearing to expect the court to simply take its word that no work-around could be found to avoid § 406(b)(3) problems with these plans. For example, one obvious work around might be to insure that those senior executives' entitled to payments under a "top hat" plan—unfunded, deferred compensation in excess of a company's basic pension plan—not act as a fiduciary with regard to decisions impacting excess payments. Even if defendants were correct, that an assignment of liabili-

ty here would have larger, unacceptable implications, the record is not sufficiently developed for the court to make that assessment at this early, pleading stage. Because § 406(b)(3) appears to prohibit the Phantom Stock payment Fenkell received, at least as currently pled, defendants' motion to dismiss plaintiffs' § 406(b)(3) claim against Fenkell will also be denied.

### 2. Defendants Mastrangelo, Seefeldt and Klute (Count VIII)

Plaintiffs allege that the trustees violated § 406(a)(1)(A) and (D) by "causing or permitting" the TBS ESOP to buy stock in a way that amounted to a direct or indirect exchange of property between the Plan and parties in interest and a transfer of assets of the plan to a party in interest. Defendants' response is that the trustees were "directed trustees" and, therefore, did not "cause" the plan to engage in the allegedly prohibited transactions.

### a. Directed trustees

█ Under § 403(a)(1) (29 U.S.C. § 1103(a)(1)), directed trustees are "subject to proper directions of [a named fiduciary who is not a trustee] which are made in accordance with the terms of the plan and which are not contrary to [ERISA]." In other words, the fiduciary duties of directed trustees are tempered by § 403(a)(1): a directed trustee can be held liable for actions taken at the direction of a named fiduciary if the direction (1) is not "proper," (2) violates the terms of the plan or (3) violates ERISA.

The TBS ESOP documents establish that the trustees are not allowed to invest funds or incur debt on their own, but only at the direction of the "Administrator," which is the "named fiduciary and plan administrator, as those terms are defined by ERISA." Plaintiffs contend that they have alleged sufficient facts that the trustees exercised functional authority to purchase the Trachte stock, as shown by their ongoing participation in the process. In particular, plaintiffs point to the April 2007 letter of intent, signed by Seefeldt and Mastrangelo, the July 2007 RSM valuation letter obtained by the trustees and the August 27, 2008 Barnes final valuation and opinion letter sent to the trustees. Leaving aside the fact that both the letter of intent and the RSM valuation letter were prepared before the August 1, 2007 formation of the Plan (and subsequent appointment of trustees), these allegations fall short of suggesting that the trustees exercised any discretion over the final decision to purchase Trachte stock.

To the extent the letter of intent suggested that the TBS ESOP trustees might have discretion to buy Trachte stock, because it described such a plan and Seefeldt and Mastrangelo signed it as "representatives" of the Plan, it is undermined by the fact that Seefeldt also signed it as the president of Trachte, which would be the Administrator of the plan. More important, any possibility of the trustees having such authority was eliminated on August 1, 2007, when the Plan became effective and gave the trustees a more limited role. As for the valuations, what they suggest is that the trustees were *informed* about the details of the transaction, not that they had the power to make a decision on their own.

Next, plaintiffs argue that § 403(a)(1) does not cover the trustees because they received their direction from Alpha, who was not a "named fiduciary." However, this point is irrelevant to whether the trustee's discretion was limited. Section 403(a)(1) simply recognizes that the "exclusive authority and discretion to manage and control assets of the plan" does not lie with the trustees when "the plan expressly

provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee." The TBS ESOP provides as much with respect to investing stock by leaving that power in the hands of the "Administrator." Regardless whether Trachte or Alpha is the Administrator, the trustees must be deemed "subject to direction" within the meaning of § 403(a)(1), because the plan "expressly provides" that they are subject to the direction of the Administrator.

b. Liability of directed trustees for § 406 violations

Defendants also contend that a directed trustee does not "cause" a plan to engage in a transaction, but rather is directed to "execute" a plan, citing in support *Harris Trust and Savings Bank v. Salomon Smith Barney,* 530 U.S. 238, 245, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000), *Tullis v. UMB Bank, N.A.,* 640 F.Supp.2d 974, 980 (N.D.Ohio 2009), and *Beauchem v. Rockford Products Corp.,* No. 01 C 50134, 2003 WL 1562561, at *2 (N.D.Ill. Mar. 24, 2003). None of these cases sweep quite so broadly, however, and there are important differences between those cases and this one. In *Harris,* the court held only that a fiduciary must "cause" a plan to engage in the transaction, 530 U.S. at 245, 120 S.Ct. 2180, hardly a useful reference because the statute itself says as much. *See* 29 U.S.C. § 1106(a)(1). In *Tullis,* the court concluded that a directed trustee was not liable under § 406, but not merely because it was "directed," rather because the participants exercised individualized control over their own assets, relieving the trustee of fiduciary obligations under § 404(c). 640 F.Supp.2d at 980–81.

The *Beauchem* decision comes the closest to being on point. 2003 WL 1562561, at *2. In that case, the court dismissed the plaintiff's claims against a directed trustee

of a bank trust. The court concluded that a directed trustee did not have a fiduciary obligation to recoup losses suffered by the plan, obtain an independent appraisal or negotiate the terms of a stock because "the plan documents do not vest [the directed trustee] with the authority or responsibility to engage in these activities." *Id.* The *Beauchem* court does not explain, however, whether the plaintiff was asserting any § 406 claim against the directed trustee or whether the absence of these duties could affect a § 406 analysis. *Id.*

Under the statute, the question remains whether the directed trustee is a "fiduciary" that "cause[d] the plan to engage in a transaction." 29 U.S.C. § 1106. Defendants fail to identify any authority that establishes that a directed trustee can never be said to "cause" a transaction. As a result, the question is whether the directed trustee played a discretionary role in bringing about the transaction here.

At least as alleged, the directed trustees here may have played a discretionary role, if only a limited one. As explained above, the directed trustee is not "subject to" a direction unless the direction is proper, made in accordance with the terms of the plan and not contrary to ERISA. Because the transaction at issue was allegedly a prohibited transaction, it would be "contrary to ERISA" and, therefore, the directed trustees may have retained discretion to reject the direction. Because defendants do not explain why a directed trustee's limited, discretionary role could not still "cause" a transaction, their motion to dismiss Count VIII will be denied.

C. *Breach of Fiduciary Duties, §§ 404 and 405*

Section 404 of ERISA (29 U.S.C. § 1104) requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," among other things, (1)

"for the exclusive purpose o[f] providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan"; (2) "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"; and (3) "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(A),(B) and (D). Plaintiffs contend that each defendant violated one or more of these provisions of ERISA § 404 by failing to perform fiduciary duties they owed to the Trachte employees during the August 2007 transaction.

### 1. Trustee of AH ESOP: Defendant Fenkell (Count II)

█ Plaintiffs contend that defendant Fenkell violated ERISA § 404 by executing Alliance's spin off of the Trachte accounts. In particular, plaintiffs contend that Fenkell had a fiduciary duty related to the transfer of AH ESOP assets and failed to "insure that the assets transferred to the Trachte [Plan] met the requirements of the Spinoff Amendment and Section 208 of ERISA." (Pls.' Opp'n Br. (dkt. # 57) at 25.) As explained above in the context of plaintiffs' § 208 claim, plaintiffs have alleged sufficient facts to allow an inference that the value of the participants' accounts was reduced immediately after the spinoff. Since defendants acknowledge that Fenkell had an obligation "to ensure that the Spin–Off complied with ERISA Section 208" and the terms of the Amendment simply track the requirements of § 208—requiring benefit equivalence "immediately after the Spin-off Date"—the

court's earlier discussion is also sufficient to support an inference that Fenkell failed to ensure that the spinoff complied with § 208 and the terms of the Spin–Off Amendment.[11] Accordingly, defendants' motion to dismiss Count II must be denied.

### 2. Duty to Monitor Fenkell: Defendant Alliance (Count V)

█ Plaintiffs also contend that defendant Alliance breached its fiduciary duties by failing to monitor Fenkell in his execution of the spinoff. In particular, plaintiffs contend that Alliance should have ensured that Fenkell complied with the terms of the Spin–Off Amendment. Defendants' arguments for dismissal again hinge on plaintiffs' § 208 claim (whether plaintiffs have alleged sufficient facts to support an inference of a reduced value in the participants' accounts immediately after the spinoff). As explained above, plaintiffs have stated a § 208 claim, so defendants' motion to dismiss Count V will also be denied.

### 3. Trustees of TBS ESOP: Defendants Mastrangelo, Seefeldt and Klute (Count VI)

Plaintiffs' § 404 claim against defendants Mastrangelo, Seefeldt and Klute relates to their role as trustees of the TBS ESOP during the 2007 transaction. As explained above, the trustees were "directed trustees" under § 403(a)(1), which means they were "subject to the direction of a fiduciary who is not a trustee," provided the fiduciary's directions were proper, made in accordance with the terms of the plan and not contrary to ERISA. What remains to be decided is whether the di-

---

11. Defendants also argue that Fenkell cannot be held liable because the Spin–Off Amendment required purely ministerial actions from plaintiff, but appear to acknowledge this is only true to the extent the spinoff did not affect the values of plaintiffs' accounts. (Dkt. # 119 at 16.)

rected trustees breached their limited fiduciary duty by following the direction they received.

a. Directions not "of a named fiduciary"

Plaintiffs' first theory of liability involves Trachte's use of Alpha as an "independent fiduciary." Under § 403, a directed trustee is only subject to "the direction of a named fiduciary." According to plaintiffs, Alpha was not a "named fiduciary" under the terms of the TBS ESOP because the plan assigns the "Administrator" as the "named fiduciary" and as the sole entity with the authority to invest in stock. As plaintiffs point out, Trachte was the plan's Administrator and Alpha was appointed only as an "independent fiduciary."

Defendants acknowledge that only the "Administrator" is a "named fiduciary," but contend that Trachte could and did assign that role to Alpha with respect to the investment of stock. As defendants put it, "[t]he Plan allows Trachte to designate any 'person or entity' to perform any of the duties of the Administrator from 'time to time.'" (Defs.' Br. (dkt. # 135) at 9 (citing TBS ESOP, § 7.2).) But § 7.2 does not allow Trachte to delegate *parts* of its work, as defendants suggest. Instead, "the Administrator shall be the Employer [Trachte] or any other person or entity designated by the Employer from time to time." In other words, § 7.2 provides a mechanism by which Trachte may assign the *entire* set of duties as Administrator to another; it does not provide for delegation of individual duties. Defendants also argue that the title given to Alpha, "independent fiduciary," should not be dispositive, but there is no suggestion that Alpha truly became the new "Administrator," with all its duties.

Because the Plan does not provide for an "independent fiduciary" to make determinations about the investment of stock, the trustees were not subject to Alpha's direction and may have breached their duties under § 404(a)(1)(D) by investing without receiving directions from the Administrator. Likewise, unless the transaction was "for the exclusive purpose of providing benefits to participants and their beneficiaries" and "prudent" under § 404(a)(1)(A) and (B), the trustees may be liable under those provisions.[12]

b. Directions not proper or in accordance with terms of plan or ERISA

Plaintiffs' alternative theory is that, even if Alpha were a "named fiduciary," the trustees' decision to follow the direction of Alpha would be a breach of their fiduciary duties because the directions were not proper or in accordance with the terms of the plan or ERISA as required under § 403(a)(1). The first question that arises relates to how much a directed trustee is required to do to ensure a direction is "proper" and to meet his or her duties in accordance with the terms of the plan and ERISA.

According to defendant Pagelow (who raised questions about the standard in the context of a claim that plaintiffs have now abandoned), ERISA does not require a trustee to disobey an "imprudent" direction, only an "improper" one, which Pagelow contends is limited to a direction that fails to "conform to certain formalities." (Defs.' Opp'n Br. (dkt. # 53) at 7 (citing *DiFelice v. U.S. Airways*, 397 F.Supp.2d 735, 747 (E.D.Va.2005))); *In re Cardinal Health, Inc. ERISA Litig.*, 424 F.Supp.2d 1002, 1037–40 (S.D.Ohio 2006); *Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir.1997); *In re Delphi Corp. Sec., Derivative & Erisa Li-*

---

12. Defendants do not even argue these issues for purposes of their motion to dismiss.

*tig.,* 602 F.Supp.2d 810, 821 (E.D.Mich. 2009).

In *DiFelice,* the court reasons that directed trustees should not be held to any duty of "prudence" because to do so would "negate the purpose and function of § 403(a)," which makes a directed trustees "subject to" the directions of the named fiduciary, and would "invite wasteful disputes and litigation between named fiduciaries and directed trustees over the wisdom of each direction." *Id.* at 751.

Plaintiffs disagree with defendants' reading, pointing to the Seventh Circuit's decision in *Summers v. State Street Bank & Trust Co.,* 453 F.3d 404 (7th Cir.2006). In *Summers,* the court of appeals stated that a directed trustee "can disobey the named fiduciary's directions when it is plain that they are imprudent," indeed *must* do so, because ERISA "forbids them to comply with directions of the fiduciary named in the plan that are not 'proper'" and "an imprudent direction cannot be a proper direction." 453 F.3d at 406–07. Although the statement in *Summers* flies in the face of defendants' position, defendants point out that this reasoning was not necessary to resolve the case because, ultimately, the court concluded that there was no breach of duty at all.

Even if the statement is *dicta,* the reasoning in *Summers* is persuasive. In *Summers,* the Seventh Circuit noted there is currently a split among the circuits, citing *Herman,* 126 F.3d at 1361–62, and *FirsTier Bank, N.A. v. Zeller,* 16 F.3d 907, 911 (8th Cir.1994), explaining that the split "reflects a confusing statutory picture" under which a directed trustee is not held liable for obeying the directions of a named fiduciary, but other fiduciaries are held liable for knowing about a breach and taking no reasonable efforts. 453 F.3d at 406 (citing 29 U.S.C. §§ 1105(b)(3)(B) and (a)(2)(3)).

As the *Summers* court points out, however, the Department of Labor has taken the position that a directed trustee has a duty of prudence, even if the trustee has no "direct obligation to determine the prudence." *Id.* at 406 (citing "Fiduciary Responsibilities of Directed Trustees," Field Assistance Bulletin 2004–03, Dec. 17, 2004). Moreover, "[t]he trustee physically controls the trust assets; knowingly to invest them imprudently or let them remain invested imprudently is irresponsible behavior for a trustee, whose fundamental duty is to take as much care with the trust assets as he would take with his own property." *Id.* at 407.

In contrast, the *DiFelice* court expressed concern that a duty of prudence could lead to "second-guessing" and unnecessary litigation. 397 F.Supp.2d at 747. That concern would seem, however, to apply to a trustee's duty to insure that a direction is not contrary to the plan or ERISA. Indeed, imprudent actions of a fiduciary are "contrary to ERISA," which would mean a directed trustee concerned about a named fiduciary's breach of the duty of prudence could, and perhaps should, "second-guess" the fiduciary. For this reason, what is needed is not a hedging away from the duty of prudence, but a limitation on the duty to investigate.

Such a limitation also explains why the Labor Department recognizes in its pamphlet that a directed trustee has a duty of prudence but no "direct obligation to determine the prudence," and why the *Summers* court recognized (in resolving the apparent tension between the arguably conflicting requirements in the Labor Department pamphlet) that a directed trustee can disobey directions "when it is plain that they are imprudent." 453 F.3d at 407.

■ This limitation also answers the next dispute between the parties—whether directed trustees ever have to perform *any* investigation to decide whether a given direction would be "proper." Although plaintiffs suggest that a directed trustee may be required to investigate when there is "evidence that [t]he direction is imprudent" (Pls.' Opp'n Br. (dkt. # 35) at 19–20), this notion has the risk of quickly devolving into a requirement that a directed trustee second-guess every direction of the named fiduciary. As the court explained in *Summers,* the duty of prudence of the directed trustee should be limited to what is "plain": where the directed trustee knows or should know (in his or her role as trustee) that a fiduciary's direction is imprudent, there is a duty to disobey the direction. *In re Worldcom ERISA Litig.,* 354 F.Supp.2d 423, 445 (S.D.N.Y.2005) (directed trustee can be held liable for what he or she knows or "ought to know"); *see also* Field Assistance Bulletin 2004–03, Dec. 17, 2004 ("when a directed trustee knows or should know that a direction from a named fiduciary is not [proper], the directed trustee may not, consistent with its fiduciary responsibilities, follow the direction").

■ Plaintiffs identify "at least five reasons" why the trustees should have known that the direction to purchase Trachte stock was imprudent and, therefore, should have declined to follow the direction: (1) a "prudent investigation" would have made it apparent that the price the TBS ESOP would pay for Trachte stock was too high; (2) the amount of debt incurred by Trachte and the TBS ESOP was more than Trachte could service; (3) the debt Trachte took on to redeem common and preferred shares and make the Phantom Stock payments reduced the value of the Trachte shares; (4) the valuation opinions provided by Stout and Barnes were not "reasonably justified" under the circumstances; (5) it was not reasonable to rely on these valuations in light of the critique in the RSM McGladrey letter; and (6) no importance was given to the failure to make an arms-length sale of the stock.

Some of plaintiffs reasons are expressly or implicitly tied to a requirement to investigate. Thus, although the valuations stated only that the Plan would be paying on the "high end" of reasonable for Trachte stock, plaintiffs contend that a "prudent investigation" would have shown that the price was too high. Similarly, the allegations do not suggest that the trustees had any reason to think Trachte would not be able to service the debt because its sales had been "soft," and would therefore have to second-guess Trachte's decision to take on the loan (if not the bank's decision to provide the loan) to develop cause for concern.

Nonetheless, the allegations suggest that the trustees should have known the direction to purchase Trachte stock would be imprudent. Although they might not have known the stock was overpriced, they knew it was on the "high end" of reasonable. They also allegedly knew that there were concerns even with those valuations, including (1) attaching value to a tax shield, (2) failing to take into account the likely effect of Trachte's taking on a $26 million loan as part of the transaction, and (3) the lack of a standard discount for the company's lack of marketability. While not overwhelming, the court cannot find on this limited record that it would be unreasonable to infer the trustees should have known the asset they were purchasing— Trachte's stock—would be adversely affected by Trachte taking on a relatively large loan. Perhaps, as defendants suggest, all these concerns will be shown to be minor, only important by hindsight. At

this early stage, however, they suffice to state a claim. Therefore, defendants' motion to dismiss count VI will be denied.

### 4. *Defendant Pagelow (Count XI)*

Plaintiffs contend that defendant Pagelow breached his fiduciary duties in violation of § 404(a)(1)(A) and (B) (29 U.S.C. § 1104(a)) when he authorized defendant Alpha to direct the Trachte trustees to complete the transaction at issue in this case. Defendant Pagelow moves for dismissal of this claim on several grounds: (1) Trachte, not Pagelow, was the "Administrator" authorized to "appoint" Alpha; (2) no facts support the conclusion that Pagelow knew or should have known that Alpha could not be appointed to act as an "independent fiduciary"; (3) there are no facts suggesting that individually Pagelow had the legal authority to "authorize" Alpha to direct the Trachte trustees; (4) the Plan authorized appointing Alpha as an "independent fiduciary" so Pagelow did not breach any duty in his alleged role; (5) if Alpha's appointment was improper, the right to direct the transaction would have reverted to the trustees or the "Administrator," not Pagelow, who never had that power; and (6) any fiduciary responsibilities Pagelow may have had disappeared when Pagelow resigned from the board on August 24, 2007, five days before the transaction was completed.

Two of these arguments may be addressed quickly. With respect to (4), defendants are mistaken in maintaining the Plan authorized the appointment of an independent fiduciary to direct a spinoff, at least as pled in the Amended Complaint. With respect to (2), the alleged facts simply do not support this argument. Pagelow was the CEO and chairman of the board of directors of Trachte, the "Administrator" of the TBS ESOP. When Pagelow went out to "engage" Alpha to act as an

independent fiduciary, he should have known whether the Plan he was "administering" on behalf of Trachte allowed Alpha to take on this role. The remaining arguments fall into two different groups: (a) arguments about the personal liability of Pagelow while acting as a corporate officer or director, and (b) arguments about the timing and result of the allegedly illegal "engagement" of Alpha.

#### a. Personal liability for actions as corporate officer or director

Points (1), (3) and (5) relate to Pagelow's alleged liability personally for actions taken on behalf of Trachte. There is no question that *Trachte* exercised discretionary authority over appointment of Alpha as a fiduciary because Trachte was the Administrator under the TBS ESOP. But plaintiffs allege that Pagelow "engaged" Alpha on behalf of Trachte as chairman of its board of directors, CEO and one of its two shareholders. Specifically, plaintiffs contend that officers or directors may be held liable as fiduciaries for actions they take on behalf of a corporation. Defendants take the opposite position: corporate officers should be shielded from liability for duties performed on behalf of their corporation.

The allegations do not suggest Pagelow took up any formal "trustee" role, but "ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Associates,* 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (citing 29 U.S.C. § 1002(21)(A)). The question whether an individual is a fiduciary boils down to the question whether that individual exercises discretionary control or authority over plan assets or plan management. 29 U.S.C. § 1002(21)(A).

The Department of Labor suggests that any director or officer assigned to perform a discretionary role should be considered a fiduciary so long as the corporate role assigned over the plan is fiduciary in nature. In ERISA Interpretative Bulletin 75–8, 29 C.F.R. § 2509.75–8, D–4 (1983), the Secretary of Labor explained that members of a board of directors of a corporation "will be fiduciaries only to the extent that they have responsibility" over plan assets or management. The Secretary went on to say that if a *board* is "responsible for the selection and retention of plan fiduciaries," *its members* are fiduciaries with respect to their selection and retention of fiduciaries.

Relying on *Confer v. Custom Engineering Co.*, 952 F.2d 34 (3d Cir.1991), defendants contend that a corporate officer remains "shielded" from liability so long as he is acting within the corporate form. In *Confer*, the court reasoned that a corporation may act as the "person" performing fiduciary functions, but when doing so through its officers and directors, the decisions of those officers and directors must be imputed to the corporation, not to the individuals. *Id.* at 37. As the court explained, to do otherwise would be to "abrogate[ ] the use of corporate structure clearly permitted by ERISA." *Id.*

Although the Court of Appeals for the Seventh Circuit has not addressed *Confer*, other courts have rejected applying so rigid a rule for determining the fiduciary status of corporate officers. *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459–61 (9th Cir.1995); *Musmeci v. Schwegmann Giant Super Mkts., Inc.*, 332 F.3d 339, 350 (5th Cir.2003). At the same time that *Confer* protects the corporate structure, it undermines ERISA's ability to hold responsible those who exercise discretion over plan accounts and plan management. As the Court of Appeals for the Ninth

Circuit pointed out in *Kayes*, ERISA regularly seeks to hold responsible those individuals exercising discretion over a plan, (1) by providing for liability against "[a]ny person" who exercises such discretion, (2) by defining "fiduciary" in terms of function rather than formal assignment, and (3) by undermining attempts to void agreements that would free a fiduciary from responsibility. 51 F.3d at 1460. *See also* 29 U.S.C. § 1110 ("any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability ... shall be void as against public policy"). These ERISA provisions all run counter to erecting an inviolate corporate shield, which would make fiduciary responsibility purely an "internal matter" for corporations. *See also Briscoe v. Fine*, 444 F.3d 478, 487 (6th Cir.2006) (unlike *Kayes, Confer* applies a "rebuttable presumption" of *no* fiduciary duty for corporate officers and directors).

Moreover, while the Seventh Circuit has not yet addressed this issue directly, it has found that the chairman of a board of directors may be a "fiduciary" without making a separate finding that the *individual* exercised discretionary control. *Leigh v. Engle*, 727 F.2d 113, 133 (7th Cir.1984). *See also Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 736 (7th Cir.1986) (concluding from *Leigh* that corporate officers were fiduciaries despite the plan providing only the "employer" corporation could amend plan). In *Leigh*, the Seventh Circuit concluded that the chairman of the board of directors of a holding company was a fiduciary of one of its controlled companies "to the extent [he] performed fiduciary functions in selecting and retaining plan administrators." 727 F.2d at 133. The court did not pause to express concern that the chairman may have been acting on behalf of the corporation and, therefore, should be "shielded." Indeed, the court quoted approvingly the

language in ERISA Interpretative Bulletin 75–8, D–4 mentioned above, albeit for a different point. *Id.*

Defendants read *Leigh* differently. For defendants, the decision supports a "rebuttable presumption" against assigning a fiduciary status to corporate officers because the court of appeals notes that the chairman exercised what the court called "real authority" over the plan by appointing "close business associates" as plan administrators. *Leigh,* 727 F.2d at 135 n. 33. However, the court of appeals relied on that activity to establish a *separate* fiduciary duty, extending beyond the fiduciary duty already established by his duties to select and retain administrators of the plan. Even if it didn't, plaintiffs have alleged enough to call into question Pagelow's conduct here.

 The question is whether Pagelow exercised discretion over plan assets or management, not whether he acted on behalf of a corporation when exercising that discretion. This does not mean, as defendants argue, that "any corporate officer or director" becomes liable for "any corporate action"; rather liability extends "to the extent" the corporate officer or director exercises control or authority over the plan on behalf of the corporation. *Leigh,* 727 F.2d at 133.[13]

b. Timing and effect of Alpha's engagement

Defendants' point (6) relates to whether Pagelow can be held liable for his role in engaging Alpha despite the fact he was not a fiduciary when the transaction occurred, having stepped down some 5 days earlier.

*See* ERISA § 409(b) (29 U.S.C. § 1109(b)) (fiduciary cannot be held liable for breach "committed before he became a fiduciary or after he ceased to be a fiduciary"). Defendants either misread § 409(b) or the nature of plaintiffs' claim against Pagelow. Plaintiffs contend that the breach occurred *while* Pagelow was a fiduciary, when he "engaged" Alpha to be a fiduciary. Even if the TBS ESOP had not come into existence on August 13, 2007, when Pagelow engaged Alpha, the Plan was made effective "retroactively" to August 1, 2007, so Pagelow could still have been a fiduciary of the Plan when he acted.

Defendants' real contention is that Pagelow's decision to "engage" Alpha could not have resulted in the alleged loss in this case because Pagelow was not "in a position" to direct the transaction. Under ERISA § 409(a), fiduciaries are liable only for actions that "result in" a particular loss. Defendants do not explain, however, why Pagelow's inability to direct the transaction interferes with what appears to be a "causal connection" between Pagelow's engaging Alpha and Alpha's directing the transaction that "resulted in" the loss. *Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir.1982) (noting that § 409(a) requires a "causal connection" between breach of fiduciary duty and loss).

Perhaps defendants are suggesting that Pagelow cannot be blamed because the directors who replaced him could have declined to accept the allegedly improper engagement but instead approved it. The new directors' approval does not erase the alleged causal connection between Pagelow and the loss; it suggests only that the new

---

**13.** As a result, it is unnecessary to consider defendants' argument that plaintiffs failed to plead sufficient facts under Rule 8 to suggest that Pagelow had the authority *personally* to appoint Alpha. *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009). Nor is it necessary to address plaintiffs' alternative argument that Pagelow engaged Alpha to perform a role not authorized by the plan and, therefore, acted on his own behalf, rather than the corporation's.

directors may have also been causal factors of the loss. Therefore, Pagelow's motion to dismiss will also be denied with respect to Count XI.

### D. Equitable Relief Against Alliance and Pagelow under ERISA § 502 (Count XII)

In Count XII, plaintiffs seek to hold defendants Alliance and Pagelow liable as the sellers who allegedly benefitted by selling Trachte shares at an inflated price during the transaction.[14] ERISA § 502(a)(3) provides that a participant may bring a civil action for "appropriate equitable relief" to redress or enforce violations of ERISA or the terms of the plan. Under § 502(a)(3), a participant may seek equitable relief from both fiduciaries and from non-fiduciaries who knowingly participate in an ERISA violation. *Harris Trust*, 530 U.S. at 248–49, 120 S.Ct. 2180.

As defendants point out, § 502(a)(3) is not a substantive provision but rather a provision for civil enforcement of ERISA. In other words, there is no "violation" of § 502(a)(3); instead, § 502(a)(3) provides a mechanism for pursuing equitable relief for other ERISA violations. However, this does not mean there is no such thing as a § 502(a)(3) "claim": when bringing a suit against a non-fiduciary for alleged ERISA violations of another, what else could a plaintiff call it? Thus, the fact that § 502(a)(3) is not technically a substantive provision is not grounds to dismiss Count XII.

At any rate, this question is not defendants' main concern. The real question is whether plaintiffs can pursue such equitable relief against Alliance and Pagelow. Defendants contend that what plaintiffs are really seeking is compensation, which

is not available under § 502(a)(3). *Mertens v. Hewitt Associates*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (section 502(a)(3) authorizes only "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)") (emphasis in original). Plaintiffs contend that they seek "restitution" or "disgorgement," which the Supreme Court has held to be "appropriate equitable relief" within the meaning of § 502(a)(3). *Harris Trust*, 530 U.S. at 253, 120 S.Ct. 2180.

However, the parties' labels do not determine whether the "restitution" or "disgorgement" plaintiffs seek is equitable; instead, this question is decided by considering the "basis for [plaintiffs'] claim and the nature of the underlying remedies sought." *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (citing *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir.1994)). As a general rule, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Knudson*, 534 U.S. at 213–14, 122 S.Ct. 708.

Ordinarily, a party seeking restitution in equity seeks "a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 213, 122 S.Ct. 708 (citations omitted); *see also id.* at 215, 122 S.Ct. 708 (trustee may maintain action for restitution of the prop-

---

**14.** Plaintiffs also intended to assert Count XII against A.H.I., which is named in the caption, but here failed to do so. Plaintiffs intend to move for leave to amend to address this de-

fect (Pls'. Br. (dkt. # 132) at) but until that happens, and until the court determines whether leave to amend is proper, A.H.I. must be dismissed from the case.

erty if not already disposed of or disgorgement of proceeds if already disposed of) (citing *Harris,* 530 U.S. at 250, 120 S.Ct. 2180). An equitable lien may also be created "by agreement or assignment," that is, when the parties agree " '[t]o dedicate property to a particular purpose, to provide that a specified creditor and that creditor alone shall be authorized to seek payment of his debt from the property or its value.' " *Sereboff v. Mid Atl. Med. Services, Inc.,* 547 U.S. 356, 367–68, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006).

 Plaintiffs allege that Alliance and Pagelow received proceeds from the Trachte stock sale that belong in good conscience to plaintiffs. Thus, plaintiffs identify "particular funds or property" that defendants allegedly have that should be returned to plaintiffs. Defendants contend that because plaintiffs seek defendants' "profit," they are really seeking compensation, but they are mistaken. Regardless whether plaintiffs seek to obtain what defendants characterize as "their" profit, if plaintiffs are correct that the Trachte sale was improper under ERISA and the proceeds belong in good conscience to the TBS ESOP participants, defendants can be required to hold the money in trust for plaintiffs. What distinguishes this case from a case for compensation is that defendants will not be held liable to pay the *value* of the proceeds, only return the proceeds (or what is traceable to the proceeds).

Next, defendants argue that plaintiffs fail to plead sufficient facts to support the conclusion that defendants have clearly traceable funds or property belonging to plaintiffs in their possession. Defendants' argument proves too much. At this early stage, plaintiffs cannot be expected to identify a specific account in which the funds are held or string of transactions that show that the proceeds can be traced. To require as much would shut the door on most, if not all, claims for such equitable relief.

Rule 8 requires that plaintiffs allege sufficient facts to make it more than speculation as to whether discovery will reveal evidence to support the claim; not that plaintiffs map out a clear path to victory. *See Twombly,* 550 U.S. at 556, 127 S.Ct. 1955 (2007); *Iqbal,* 129 S.Ct. at 1950. After discovery, plaintiffs may well be able to identify traceable funds, because proceeds obtained in a transaction such as this one have a good chance of being invested. This is so regardless whether there would be specific tax benefits to such an investment.[15]

Because plaintiffs allege that defendants received the proceeds of the stock sale and do not allege that the funds were simply dissipated, defendants' motions to dismiss Count XII will be denied.

## ORDER

IT IS ORDERED that:

1. The motion for leave to file documents outside the pleadings filed by defendants James Mastrangelo, Jeffrey A. Seefeldt and Pamela Klute (dkt. # 114) is DENIED as unnecessary.

2. The motions to dismiss the complaint, filed by defendants Mastrangelo, Seefeldt and Klute, dkt. # 112; defendant Stephen W. Pagelow (dkt. # 110); and defendants Alliance Holdings, Inc., A.H.I., Inc. David B. Fenkell (dkt. # 118) are GRANTED in part and DENIED in part as follows:

**15.** Plaintiffs allege that both defendants would receive such benefits, but defendant Alliance disagrees that it would be eligible for such a benefit.

(a) the following two of plaintiffs' three theories of liability as to Count I are dismissed for failure to state a claim: (i) that Alliance violated § 208 because plaintiffs lost a "put option", and (ii) that Alliance violated § 208 because plaintiffs lost a "control premium;"

(b) Defendant A.H.I. is DISMISSED from the case; and

(c) Defendants' motions are DENIED in all other respects.